Larry E. Prince (ISB # 1759)
Robert A. Faucher (ISB # 4745)
Katherine L. Georger (ISB # 8188)
HOLLAND & HART LLP
Suite 1400, U.S. Bank Plaza
101 South Capitol Boulevard
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:  (208) 342-5000
Facsimile:   (208) 343-8869
E-Mail:  lprince@hollandhart.com
          rfaucher@hollandhart.com
          klgeorger@hollandhart.com

Attorneys for Sunshine Precious Metals, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:  Sterling Mining Company,<br><br>                              Debtor. | USBC Case No. 09-20178-TLM<br><br>USDC Case No. 09-465-N-EJL |
| Sunshine Precious Metals, Inc.,<br><br>                              Appellant,<br><br>v.<br><br>Sterling Mining Company,<br><br>                              Respondent. | **APPELLANT'S OPENING BRIEF** |

# TABLE OF CONTENTS

**Page**

I.     Statement of the Basis of Appellate Jurisdiction ...................................................... iii

II.    Statement of the Issues Presented .................................................................1

III.   Applicable Standard of Review .................................................................1

IV.    Statement of the Case and Facts .................................................................2

    A.    Nature of the Case.................................................................2

    B.    Course of the Proceedings. .................................................................2

    C.    Disposition in the Court Below.................................................................3

    D.    Statement of the Facts.................................................................3

        1.    The Lease. .................................................................3

        2.    Debtor's Prepetition Operation of the Mine.................................................4

        3.    Debtor's Economic Distress and Termination of the Lease.................................5

        4.    The Filing of the Bankruptcy Case and the Lease Assumption Proceedings.............10

V.     Summary of the Argument.................................................................11

VI.    Argument .................................................................12

    A.    Debtor Could Assume or Reject the Lease *If* the Lease Remained in Existence Post-Petition..................................................................12

    B.    The Parties Terminated the Lease Prepetition. .................................................13

    C.    The Bankruptcy Court's Decision that Debtor Satisfied Bankruptcy Code Section 365(b) and Could Therefore Assume the Lease Was Erroneous......................17

        1.    Bankruptcy Code Section 365(b) Requires that Defaults Be Determined and Cured as Part of Assumption..................................................................17

        2.    The Bankruptcy Court's Approval of Debtor's Assumption of the Lease Was In Error Because the Amount of the Defaults to EPA and the Tribe Were Not Determined or Cured. .................................................................19

            a.    The Bankruptcy Court Erred In Applying Bankruptcy Code Section 365(b)(1)(A) to the Net Smelter Return Royalty Default  Because it Did Not Determine the Amount of the Default. .........................................21

**TABLE OF CONTENTS - i**

b.   The Bankruptcy Court Erred by Applying Bankruptcy Code Section 365(b)(1)(C) to the Penalty Default Rather than Bankruptcy Code Section 365(b)(1)(A)......................................................................................22

c.   The Bankruptcy Court Erred by Applying Bankruptcy Code Section 365(b)(1)(C) to the Environmental  Remediation Obligations Rather than Bankruptcy Code Section 365(b)(1)(A)..............................................24

d.   The Bankruptcy Court Erred by Failing to Require Debtor to Bear Its Burden of Proving that It Would Cure the Defaults Under Bankruptcy Code Section 365(b)(1)(A). ...................................................25

e.   Subsequent Events Reveal that the Bankruptcy Court Put the Cart Before the Horse. ............................................................................................26

VII.   Conclusion ...........................................................................................28

**TABLE OF CONTENTS - ii**

# TABLE OF AUTHORITIES

## FEDERAL CASES

*City of Valdez v. Waterkist Corp. (In re Waterkist Corp.)*, 775 F.2d 1089 (9th Cir. 1985) ...................................................................................................................12, 13

*Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.)*, 190 B.R. 370 (9th Cir. BAP 1996) ...................................................................................................................17

*In re C.W. Mining Co.*, 2009 WL 3568635 (Bankr. D. Utah 2009) .....................18, 19, 20

*In re Embers 86th St., Inc.*, 184 B.R. 892 (Bankr. S.D.N.Y. 1995)....................................18

*In re F.W. Restaurant Assocs., Inc.*, 190 B.R. 143 (Bankr. D. Conn. 1995) ....................18

*Fitzgerald v. First Sec. Bank*, 178 B.R 497 (D. Idaho 1994)..............................................23

*Gen'l Elec. Co. v. Future Media Prods.*, 547 F.3d 956 (9th Cir. 2008)..............................1

*Hale v. United States Bankruptcy Trustee (In re Jones)*, 2006 WL 694639 (D. Idaho 2006) ..........................................................................................................1

*In re Harris Mgmt. Co.*, 791 F.2d 1412 (9th Cir. 1986) ....................................................17

*In re Herbert*, 806 F.2d 889 (9th Cir. 1986) ......................................................................13

*In re Int'l Fibercom, Inc.*, 503 F.3d 933 (9th Cir. 2007)....................................................12

*Lewis Indus. v. Barham Constr., Inc.*, 878 F.2d 1230 (9th Cir. 1989)..............................18

*In re M. Fine Lumber Co.*, 383 B.R. 565 (Bankr. E.D.N.Y. 2008) ............................18, 23

*Murray v. Bammer (In re Bammer)*, 131 F.3d 788 (9th Cir. 1997) ....................................2

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)...........................................................18

*In re Nat'l Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000) ......................................................18

*In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665 (9th Cir. 2007)..............................13

*In re RVP, Inc.*, 269 B.R. 851 (Bankr. D. Idaho 2001)..........................................17, 18, 19

*Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077 (9th Cir. 1989) ...........................18

*In re Tobago Bay Trading Co.*, 142 B.R. 528 (Bankr. N.D.Ga. 1991)..............................14

**TABLE OF AUTHORITIES - iii**

*In re U.S. Wireless Data, Inc.*, 547 F.3d 484 (2d Cir. 2008) .................................18, 19, 26

*Vanderpark Props., Inc. v. Buchbinder (In re Windmill Farms, Inc.)*, 841 F.2d
  1467 (9th Cir. 1988)...........................................................................................1, 12

*In re Wegner*, 839 F.2d 533 (9th Cir. 1988) ...................................................................16

## STATE CASES

*Boise Joint Venture v. Moore*, 806 P.2d  707 (Or. Ct. App. 1991)....................................13

*City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 81 Cal. Rptr. 3d 72
  (Ct. App. 2008) ..................................................................................................16


*Idaho First Nat'l Bank v. Bliss Valley Foods*, 121 Idaho 266, 824 P.2d 841 (1991).........16

*Olsen v. Country Club Sports, Inc.*, 718 P.2d 1227 (Idaho Ct. App. 1986)................13, 14

*Resource Engineering, Inc. v. Siler*, 94 Idaho 935, 500 P.2d 836 (1972) ........................13

## DOCKETED CASES

*United States of America v. Asarco Incorporated, et al.*, Consolidated Cases No.
  96-0122-N-L (D. Idaho 2001).............................................................................4

## STATUTES

11 U.S.C. § 102(6) ...........................................................................................................13

11 U.S.C. § 301(a) ...........................................................................................................13

11 U.S.C. § 301(b) ...........................................................................................................13

11 U.S.C. § 365........................................................................................................12, 18, 26

11 U.S.C. § 365(b) ...........................................................11, 12, 17, 18, 20, 23,
  24, 25, 26, 28

11 U.S.C. § 365(b)(1) .................................................................................................18, 21

11 U.S.C. § 365(b)(1)(A).....................................................17, 21, 22, 23, 24, 25

11 U.S.C. § 365(b)(1)(C) .................................................................... 22, 23, 24, 25

11 U.S.C. § 365(c)(3)........................................................................................................12

11 U.S.C. § 1104................................................................................................................12

28 U.S.C. § 158(a)(1).........................................................................................................1

## MISCELLANEOUS

H.C. Black, *Black's Legal Dictionary* 23 (6th ed. 1990)...................................................15

3 COLLIER ON BANKRUPTCY ¶ 365.02[2] at 365-22.........................................................13

## RULES

Fed. R. Bankr. P. 6006.......................................................................................................18

Fed. R. Bankr. P. 6006(c)...................................................................................................19

Fed. R. Bankr. P. 9013.......................................................................................................19

Fed. R. Bankr. P. 9014.......................................................................................................19

## I.      STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The district court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

This appeal was originally assigned to the Ninth Circuit Bankruptcy Appellate Panel ("BAP")

but was transferred to the district court after appellant Sunshine Precious Metals, Inc.

("Landlord") objected to BAP determination.

## II.      STATEMENT OF THE ISSUES PRESENTED

Landlord raises three issues in this appeal:

1.      Did the bankruptcy court err when it determined that the mine lease between

Landlord and Debtor existed as of the petition date even though Debtor had, prepetition,

voluntarily surrendered possession of the mine to Landlord in accordance with a written

agreement describing the change as a "termination" of the lease?

2.      Did the bankruptcy court err when it ordered Landlord to return possession of the

mine to Debtor post-petition even though Debtor had surrendered possession to Landlord

prepetition?

3.      Did the bankruptcy court err when it granted Debtor's motion to assume the mine

lease even though Debtor had no cash and faced outstanding and unresolved cure claims totaling

several million dollars?

## III.      APPLICABLE STANDARD OF REVIEW

This court reviews the bankruptcy court's conclusions of law de novo and the bankruptcy

court's findings of fact under the clearly erroneous standard.  *Gen'l Elec. Co. v. Future Media

Prods*., 547 F.3d 956, 959 (9th Cir. 2008); *Vanderpark Props., Inc. v. Buchbinder* (*In re

Windmill Farms, Inc*.), 841 F.2d 1467, 1469 (9th Cir. 1988); *Hale v. United States Bankruptcy

Trustee* (*In re Jones*), 2006 WL 694639 at *1 (D. Idaho 2006) (Lodge, J.).

**APPELLANT'S OPENING BRIEF - 1**

Mixed questions of law and fact are reviewed de novo.  "A mixed question of law and fact occurs when the historical facts are established; the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule."  *Murray v. Bammer* (*In re Bammer*), 131 F.3d 788, 791-92 (9th Cir. 1997).

## IV.   STATEMENT OF THE CASE AND FACTS

**A.   Nature of the Case.**

The bankruptcy court granted Debtor's motion to assume a mine lease between it and Landlord.  In connection with that determination, the bankruptcy court ordered Landlord to deliver possession of the mine to Debtor, and granted Debtor's motion to incur related post-petition financing.

Landlord originally appealed all three of the bankruptcy court's orders, ER 771-773, but in this Brief will be challenging only the order approving the lease assumption and the order requiring Landlord to turnover possession of the mine to Debtor.

**B.   Course of the Proceedings.**

Debtor filed its voluntary chapter 11 bankruptcy petition on March 3, 2009.  ER 209-241. Debtor asserted that a principal asset in its bankruptcy estate was its alleged interest as tenant-optionee under a written lease agreement, with option to purchase (the "Lease"), between it and Landlord.  ER 252; ER 698-700, 698.  The Lease pertained to the historic Sunshine Mine in Kellogg, Idaho (the "Mine").  ER 100-123.

On March 25, 2009, Debtor moved to assume the Lease under Bankruptcy Code section 365.[1]  ER 268-307.  Debtor acknowledged that it needed funds to assume the Lease; accordingly, at about the same time, it moved to incur post-petition financing.  ER 334-341.

---

[1] The Bankruptcy Code is title 11 of the U.S. Code.

**APPELLANT'S OPENING BRIEF - 2**

Debtor had voluntarily turned over possession of the Mine to Landlord prepetition. Debtor commenced a separate post-petition adversary proceeding seeking a bankruptcy court order compelling Landlord to return possession of the Mine to Debtor, and also filed an emergency motion for an order of the bankruptcy court compelling Landlord to turn the mine over to Debtor.  ER 246-251; ER 692-697.

**C.    Disposition in the Court Below.**

The bankruptcy court granted Debtor all of the relief it sought.  ER 701-712; ER 713-721; ER 722; ER 723-768; ER 769-770.

**D.    Statement of the Facts.**

1.    <u>The Lease</u>.

Landlord is an Idaho mining company that owns the historic Sunshine Mine in Kellogg (the "Mine").  ER 723-768, 725.  Debtor is likewise an Idaho mining company.  Debtor is publicly-held.  ER 581-604, 585.

In 2003, six years prior to the filing of Debtor's petition, Landlord leased the Mine to Debtor, as lessee, under a written lease agreement (the "Lease").  ER 723-768, 725; ER 590-591; ER 100-123.  The Lease was for a 15-year term with three options to extend.  ER 723-768, 725; ER 100-123, § 4.1.  In the Lease, Landlord granted Debtor an option to purchase the Mine at a price to be based on silver prices at the time of exercise.  ER 723-768, 725-26; ER 100-123 § 20.3.

Among Debtor's obligations under the Lease was an obligation to hold Landlord harmless from all liabilities associated with Debtor's possession and operation of the Mine during the Lease term.  ER 723-768, 733-737; ER 100-123, §§ 13.2, 13.5.  Two principal liabilities are at issue here.  First, there is an obligation on the part of the operator of the Mine to pay net smelter return royalties to the Environmental Protection Agency ("EPA") and the Coeur

**APPELLANT'S OPENING BRIEF - 3**

d'Alene Tribe of Indians (the "Tribe") on ore extracted from the Mine.  ER 689-691; ER 620-622; ER 001-57, 20; ER 1079-1108.  The net smelter royalty obligation arose under a consent decree entered by this Court in 2001.  ER 723-768, 733-737; ER 620-622; ER 001-57, at 20.[2]  If the royalties were not paid timely, penalties became owing.  ER 001-57, 20-23.  By agreeing in the Lease to hold Sunshine harmless from that obligation, Debtor was agreeing that it would pay the royalties (and penalties, if any) to the EPA and the Tribe if it were to extract ore from the Mine.  ER 723-768, 735, n.19; ER 100-123, § § 13.2, 13.5; ER 58-59.

Second, Debtor agreed to hold Landlord harmless from all environmental liabilities arising while Debtor was in possession of the Mine during the term of the Lease.  ER 723-768, 738; ER 100-123, § § 13.2; 13.5; ER 1109-1110; ER 001-57; ER 124-154.[3]

2.   Debtor's Prepetition Operation of the Mine.

Debtor extracted significant amounts of ore from the Mine in 2006-2008, generating revenues of more than $7.0 million.  ER 253-267, 253.  Debtor did not pay the royalties to EPA or Tribe that arose in respect of its extraction of ore from the Mine.  ER 723-768; 734-735, n.19; ER 774-907; ER 908-921.  The consent decree provides for penalties in the event of non-payment.  ER 001-57; 20-23.  Debtor did not pay the penalties either.  ER 774-907; ER 908-

---

[2] "Partial Consent Decree with Sunshine Mining and Refining Company and Sunshine Precious Metals, Inc.," entered on January 22, 2001, in *United States of America v. Asarco Incorporated*, *et al*., Consolidated Cases No. 96-0122-N-EJL and 91-0342-N-EJL, United States District Court, District of Idaho.  *See also* Debtor's Proposed Reorganization Plan, ER 922-964, 928-929 (estimating claims owed to the EPA and Tribe to be as high as $3.8 million).

[3] Correspondence between Jennifer Bryne, Assistant Regional Counsel for the EPA, and Robert Higdem, Debtor's Environmental Manager, memorialized oral conversations between Debtor and the EPA in early March 2009, in which Debtor acknowledged and accepted responsibility for the financial penalties incurred to resolve approximately 82 Clean Water Act violations that manifested during the period of Debtor's operation and maintenance of the Mine.  ER 1109-1110; ER 685-691, 686-687.

**APPELLANT'S OPENING BRIEF - 4**

921;ER 723-768, 735-37.[4]  The consent decree required Debtor to submit quarterly reports to

EPA and the Tribe, but Debtor did not do so.

       3.     <u>Debtor's Economic Distress and Termination of the Lease</u>.

Debtor began experiencing economic distress in 2008.  ER 623-657, 626; ER 581-604,

585-586.  Debtor ceased extracting ore from the Mine in Fall 2008, and simply was keeping the

mine in "operation ready" or potential "turn-key" condition. ER 623-657, 626; ER 581-604, 585-

586.  Maintaining a silver mine is expensive, even if mineral is not being extracted form the

Mine.  ER 623-657, 626; ER 581-604, 585-586.  In Debtor's case, the cost of maintaining the

Mine during Fall 2008 and Winter 2009 amounted to approximately $250,000 per month.  ER

623-657, 626; ER 184-185.

By Fall 2008, Debtor was deeply entrenched in financial crisis.  ER 623-657, 627; ER

581-604, 585-586; ER 155-156.  Consequently, in October 2008, Debtor's CFO stepped down

and Kenneth Rux, a board member, stepped into the CFO position.  ER 581-604, 584.  Rux

testified that during Fall 2008, it was a challenge for Debtor just to keep its employees paid in

order maintain the Mine facilities.  ER 584; ER 155-156; ER 157-158.[5]  Debtor liquidated many

assets to stay afloat.  For example, during two board of directors meetings held on December 8,

---

[4] Debtor admits the penalty claims total approximately $4 million.  ER 989-993, 993; ER 922-
964, 929. The exact amount of the royalty and penalty obligation remains presently unliquidated;
to date, the royalties and penalties remain unpaid.  ER 922-964, 929.

[5] Minutes from Board meetings throughout the Fall of 2008 detail Debtor's intractable financial
struggles.  For example: Minutes from the November 13, 2008 Board Meeting, included a report
from Board Member Gary Chapman examining the potential for future bankruptcy & its inability
to pay employees, taxes or utilities, ER 155-156, 156; Minutes from the November 21, 2008
Board Meeting, included discussion of procedure for filing a Chapter 11 petition, ER 157-158,
158; Minutes from the December 8, 2008 Board Meeting, included discussion of "negotiating"
with major creditors as alternative to Bankruptcy filing, ER 159-161; Minutes from December 9,
2008 included discussion meetings with creditors and the "Sunshine Group" in an effort to
"salvage" the company, ER 162-164, 162, additionally a "discussion ensued relative to totally
shutting down the mine" ER 162-164, 164.

**APPELLANT'S OPENING BRIEF - 5**

2008 and December 9, 2008, board members discussed the sale of 3.8 million shares of stock through a Canadian brokerage house, disposing of Debtor's mine holdings in Mexico, and alternative funding possibilities from outside companies interested in purchasing Debtor's tax loss as a means of raising funds.  ER 585-588; ER 159-161, 161; ER 162-164.

To make matters worse, at least two of Debtor's creditors placed mechanics' liens on the property, rendering Debtor in breach of the Lease terms.  ER 623-657, 626; ER 605-622, 607-609; ER 100-123, § 13.3, § 17.1(b); ER 333 (Atlas Lien); ER 580 (Miller Lien)).  Consequently, Landlord issued notices of Debtor's default based on these breaches, as well as other defaults under the terms of the Lease, including Debtor's failure to pay certain claims and its unauthorized assignments of the Lease without Landlord's consent.  ER 623-657, 626; ER 607-617; ER 658-659.  In response, Debtor demanded mediation in Fall 2008 pursuant to the Lease terms, to resolve the outstanding defaults.  ER 623-657, 627; ER 723-768, 728.  Mediation proved fruitless.  ER 623-657, 627; ER 723-768, 728.

Faced with mounting fiscal and operational difficulties, Debtor made a last ditch effort in December 2008 through January 2009 to restructure the Board and resolve its deepening financial troubles.  ER 623-657, 627; ER 172-176.  Specifically, the board of directors convened on December 16, 2008, to discuss resignations and proposed resignations of sitting board members.  ER 165-168.  On December 22, 2008, the board discussed specific replacements and resolved to act on the board reshuffling early in the new year.  ER 169-171.

On January 10, 2009, the board accepted several director resignations and elected new directors as replacements, including John Ryan of U.S. Silver Corporation joined Debtor's board and served briefly as Debtor's president and CEO.[6]  ER 623-657, 627; ER 165-168; ER 169-171; ER 172-176, 174.  The same day that Ryan joined the board, Andrew Grundman and David

**APPELLANT'S OPENING BRIEF - 6**

Greenway also joined the Debtor's board.  ER 623-657, 627; ER 172-176, 172-173.  Grundman was general manager of Landlord from 2002 through 2005 and was involved in the negotiation of the 2003 Lease agreement between Debtor and Landlord.  ER 623-657, 628; ER 172-176, 173.  Greenway was CEO of SNS Silver Corporation, another Idaho mining company.  ER 623-657, 628; ER 172-176, 172.[7]

Ryan, Grundman and Greenway were each brought on to offer their specific skill-sets and render "crisis management" to Debtor's ailing enterprise.  ER 623-657, 627 & nn. 7, 9 (discussing the "fluid" nature of mining companies in the Silver Valley and the frequent shifting of boards); ER 623-657, 628-629; ER 605-622, 618-619; ER 169-171 (discussing Greenway & Grundman's "master plan for the Company"); ER 124-154 (discussing Greenway & Ryan's proposed "redefining the leadership, business plan and strategy of the company wherein part of the plan may be to combine with SNS Silver")).  In particular, Grundman testified that he was approached by Debtor's Board primarily because of his on-going business relationship with Debtor's principal officer, Robert Mori, and direct knowledge and experience with the Lease negotiations.  ER 623-657, 628-629; ER 605-622, 618-619; ER 172-176.

Despite this board re-shuffling,[8] Debtor's intractable financial problems proved to be too much.  ER 623-657, 629-630.  Ultimately, Debtor simply ran out of cash in early 2009.  ER 723-768, 727.; ER 581-604, 604.  Debtor's newly appointed board of directors convened a total of nine board meetings during the first two months of 2009.  ER 623-657, 629; ER 172-176; 177-

---

[6] Ryan resigned just prior to Debtor's March 3, 2009 bankruptcy filing.  ER 623-657, 627.

[7] SNS Silver acquired temporary possession of the Mine through an interim Lease at the end of February and then executed a formal Lease on April 13, 2009.  ER 723-768, 728, n.9.  Subsequently, SNS Silver relinquished possession back to Landlord on July 14, 2009.  ER 723-768, 728, n.9.

**APPELLANT'S OPENING BRIEF - 7**

180; 181-183; 184-185; 189-191; 200-201; 206; 207-208.  These meetings detailed Debtor's

bleak financial prospects and downward spiral. ER 623-657, 629; ER 172-176; 177-180; 181-

183; 184-185; 189-191; 200-201; 206; 207-208.

On February 17, 2009, Rux, Debtor's CFO, reported that Debtor only had $2,000 in the

bank, but had liabilities of approximately $5,000 for employee wages, $30,000 in payroll taxes,

$60,000 in insurance.  ER 623-657, 629; ER 192-194.  Yet, the most immediate threat Debtor

faced was its delinquency of approximately $50,000 owing to the power utility company.  ER

623-657, 629; ER 192-194.  Rux informed the Board that electricity to the Mine would be shut

off within a week unless the utility received payment.  ER 623-657, 629; ER 192-194.  Without

power to properly ventilate the Mine, there would be substantial damage to equipment and

machinery from surrounding moisture.  ER 623-657, 630; ER 192-194.

Unable to financially continue maintenance of the Mine, the board unanimously passed a

resolution at the February 17 Board providing that: "motion forwarded to allow management,

including Mr. Grundman and Mr. Greenway, ***to negotiate a final transition and operating

agreement*** between [Landlord and Debtor] subject to final approval by the Board."  ER 189-191;

ER 192-194.  The board's authorization of final transition negotiations regarding the mine also

corresponded with a bankruptcy proposal to be taken up by the board two days later.  ER 623-

657, 630; ER 189-191.

Pursuant to the February 17 resolution, Grundman testified that on February 18, 2009, he

participated in a teleconference with Mori, Greenway, Ryan and Debtor's principal Ray

DeMotte.  ER 619a, 619b, 623-657, 631.  Landlord and Debtor agreed that Debtor would give

---

[8] Debtor's board room was filled with an ever-changing cast of characters.  Fourteen persons had
been fired from, or left, Debtor's board of directors during the nine months prior to the
bankruptcy filing.  ER 253-267, 266.

**APPELLANT'S OPENING BRIEF - 8**

the Mine back to Landlord and Debtor would walk away. ER 619A, 619B, 623-657, 631. The parties agreed Debtor would not be retaining any rights under the Lease. ER 623-657, 631.

Debtor's board of directors reconvened on February 19, 2009. ER 623-657, 632; ER 202-203; ER 200-201. The meeting minutes detailed Debtor's deteriorating financial condition and dismal outlook. ER 623-657, 632; ER 202-203; ER 200-201. Specifically, Board members discussed Debtor's inability to pay the Mine's utilities, incapacity to fund its employees insurance, payroll, payroll taxes and its failure to stay current on payments under the terms of the Lease. ER 623-657, 632; ER 202-203; ER 200-201. Recognizing its precarious financial situation, Ryan presented a resolution to the Board regarding termination of the Lease. ER 623-657, 632; ER 202-203; ER 200-201. The board adopted a resolution directing "**the officers take all necessary steps to vacate the premises immediately and release the mine back into [Landlord's] hands** with final documentation to be completed on 3:00 pm next Tuesday, February 24th." ER 623-657, 632; ER 202-203; ER 200-201 (emphasis added).

On that same day, February 19, Debtor executed a "Waiver." ER 204-205. In that document, Debtor also agreed that it would, in the future, "instruct counsel to formally acknowledge default of the terms and conditions and termination of the Lease, which is forthcoming. It is in the best interest of SPMI and Sterling to secure the Lease Property in the intervening time." ER 204-205. The fact that the parties were to "formally *acknowledge*" termination pursuant to a subsequent document (emphasis added) constituted a recognition that – as of the time of February 19 Waiver – the Lease had, in fact, already been terminated. ER 623-657, 634; ER 604; ER 581-604, 589-590, 594-595, 596.

On or about February 19, 2009, in accordance with the terms of the February 19 Waiver, Debtor surrendered possession of the Mine to Landlord. ER 723-768, 728; ER 581-604, 583; ER

**APPELLANT'S OPENING BRIEF - 9**

581-604, 589-590, 594-595.[9]  Landlord took possession of the Mine and assumed all financial responsibility for maintaining the Mine.  ER 592-593; ER 597-598, 599-603.  Debtor considered the Lease terminated.  ER 592-593; ER 597-598, 599-603.

Regarding the Lease as terminated, Landlord retained and engaged SNS Silver Corp. to maintain the Mine after Debtor terminated the Lease and vacated the Mine.  ER 723-768, 728; ER 186-188; ER 308-332; ER 244-245; ER 606.

     4.    <u>The Filing of the Bankruptcy Case and the Lease Assumption Proceedings</u>.

On March 3, 2009, Debtor filed its chapter 11 petition.  ER 209-241.  It had a mere $5,000 in cash on hand on the petition date.  ER 252.  The Court established a August 31, 2009 bar date for the filings of proofs of claim of governmental units such as EPA and the Tribe.  ER 242-243.

Notwithstanding that Debtor had abandoned the Mine and terminated the Lease prepetition, Debtor's attorneys reversed course after the filing of the petition, taking the position that the Lease had not been terminated prepetition and could thus be assumed.  ER 246-251; 250-51; ER 268-307, 271.  Debtor filed a motion to assume the Lease and filed an adversary proceeding to compel Sunshine to turn over possession of the Mine to Debtor. ER 246-251; 250-51; ER 268-307, 271.  Debtor asserted that the purchase price for the Mine established in the purchase option contained in the Lease was millions of dollars below the actual market value of the Mine.  ER 268-307, 275.

A critical issue at the lease assumption hearings was whether Debtor would and could cure its pre-petition defaults to pay EPA and the Tribe the net smelter return royalties, plus

---

[9] The court appointed Receiver testified to a photo and local newspaper article showing the "handover of the keys" of the Mine from Debtor to Landlord on February 23, 2009.  ER 582. Rux testified that Debtor relinquished possession to Landlord on February 24, 2009.  ER 594-595.

concomitant penalties that EPA and the Tribe were asserting.  ER 723-768, 733-737, 738, 741-743, n.26.  Notwithstanding that, Debtor failed to provide notice to the Tribe of its motion to assume the Lease.  ER 268-307; ER 723-768, 740, n.21.  Moreover, all the hearings before the bankruptcy court, and the entry of the bankruptcy court's decisions, took place prior to the August 31, 2009 bar date for the filing of EPA's and the Tribe's claims.  ER 242-243.

Sunshine nonetheless put in substantial evidence as to what the amount of the unpaid royalty payments and penalties were, based on the materials available to it.  ER 723-768, 733-737.  The evidence showed that the unpaid royalties exceeded $380,000, and Debtor admitted that amount was owing.  ER 723-768, 734-735.  Evidence showed that the penalties could equal $1.455 million or more.  ER 723-768, 735; ER 605-622, 622; ER 001-57, 20, ¶ 34.  Yet, according to Debtor's recent Proposed Reorganization Plan, Debtor concedes that the amount of the royalty obligation and associated penalties owing under its operation of the Mine is upwards of $882,000 and could be as high as $3.8 million.  ER 922-964, 929.

To date, the amount of the royalty and penalty obligations to EPA and the Tribe remain presently unliquidated and unpaid.  ER 723-768, 734-737; ER 922-964, 929.

## V.    SUMMARY OF THE ARGUMENT

At issue is whether Debtor can assume the Lease and thereby realize the supposedly below-market purchase option for the benefit of the bankruptcy estate.  Loathe to see that potentially valuable asset slip away, and eager, instead, to preside over a successful reorganization of a publicly-held company, the bankruptcy court held both that the Lease remained in existence post-petition, and that Debtor was entitled to assume the lease under Bankruptcy Code section 365(b).

Both of the bankruptcy court's rulings were in error.

**APPELLANT'S OPENING BRIEF - 11**

First, the Lease was terminated prepetition and there was, accordingly, nothing left for Debtor to assume.  *Infra* at 12-16.

Second, before a debtor can assume an executory contract, any defaults must be identified and quantified, and the debtor must then prove it will cure the defaults or provide "adequate assurance" that it will promptly cure the defaults.  The bankruptcy court granted Debtor's motion to assume the Lease even though the defaults under the Lease were not quantified and Debtor did not prove it could cure the default.  This error was in derogation of Landlord's rights under the Bankruptcy Code.  *Infra* at 17-28.

## VI.    ARGUMENT

### A.    Debtor Could Assume or Reject the Lease *If* the Lease Remained in Existence Post-Petition.

Bankruptcy Code section 365 governs treatment of a debtor's executory contracts.  Under section 365 , the bankruptcy "trustee" can assume or reject the debtor's executory contracts.  A debtor in possession like Debtor has the rights and powers of a bankruptcy trustee.  Bankruptcy Code § 1104.  Accordingly, Debtor could potentially assume or reject the Lease.  *See generally In re Int'l Fibercom, Inc.*, 503 F.3d 933, 941 (9th Cir. 2007); *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 669-70 (9th Cir. 2007).

However, "'[t]he trustee *may not* assume . . . any executory contract or unexpired lease of the debtor . . . *if* . . . such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.'  11 U.S.C. § 365(c)(3)."  *Windmill Farms*, 841 F.2d at 1469 (*quoting City of Valdez v. Waterkist Corp.* (*In re Waterkist Corp.*), 775 F.2d 1089, 1091 (9th Cir. 1985) (emphasis added).  The phrase 'applicable nonbankruptcy law' means applicable state law.  *Id.*  "Simply put, if a lease of nonresidential real property has been terminated under state law before the filing of a bankruptcy petition, there is nothing left for the

trustee to assume." *Id.  See also In re Herbert*, 806 F.2d 889 (9th Cir. 1986).[10]  The party

seeking to assume a lease has the burden of proving that a lease is still assumable.  3 COLLIER ON

BANKRUPTCY ¶ 365.02[2] at 365-22.

     The bankruptcy court correctly recognized that whether the Lease was terminated

prepetition was a threshold issue.  ER 636.  However, the bankruptcy court incorrectly

determined that the Lease was not terminated prepetition.   ER 648.  The bankruptcy court's

decision was erroneous.

**B.      The Parties Terminated the Lease Prepetition, Precluding Assumption.**

     State law governs contract formation and termination.  In Idaho, courts determine

whether a contract has been terminated by examining what the parties intended "as manifested

by their words and acts."  *Olsen v. Country Club Sports, Inc*., 718 P.2d 1227, 1231 (Idaho App.

1986) (explaining that this "determination is necessarily a factual one."). Termination can occur

through mutual agreement or operation of law.  *Id.*  Termination by mutual agreement may be

obtained through "mutual consent of the contracting parties notwithstanding a provision in the

contract specifying a method of cancellation."  *Resource Engineering, Inc. v. Siler,* 94 Idaho 935,

937, 500 P.2d 836, 838 (1972) (citing cases) (noting that consent made to modification of a prior

written contract may be inferred from a course of conduct between the parties).

     Alternatively, a lease may be terminated through the "conduct of the parties such that, as

a matter of law" the court can conclude that the termination is effective.  *Id.* at 1232.  This means

that if in total the conduct and words of the parties are inconsistent with the terms of the contract,

then a contract is "as a matter of law" terminated.  *Id.  Boise Joint Venture v. Moore*, 806 P.2d

707, 709 (Or. Ct. App. 1991) (applying Idaho law and *Olsen* to find that "Defendant surrendered

---

[10] A debtor in possession's voluntary petition constitutes an "order for relief."  Bankruptcy Code §§ 102(6), 301(a), 301(b).

his tenancy when he *notified* [lessor] that he would make no more payments under the lease" and that the by allowing property to go to foreclosure, lessor's "conduct was inconsistent with the continuation of the tenancy" and such "conduct constituted acceptance of the surrender by operation of law.").  *Cf. In re Tobago Bay Trading Co*., 142 B.R. 528 (Bankr. N.D.Ga. 1991) (noting that under state law, "an agreement to terminate a lease may be implied by acts of the lessor where surrender of the premises is accepted and the lessor thereafter acts inconsistent with the lessee's rights.").

As set forth above, the facts here clearly demonstrate that the parties terminated the Lease in February 2009.  The critical facts are relatively straightforward and are as follows:

- Debtor completely ran out of money and could no longer maintain the Mine. A crisis mentality prevailed.

- The parties participated in a February 18 telephone call in which they agreed that Debtor would give up the Lease and the Mine and deliver possession of the Mine to Landlord.  The parties agreed that the Lease was terminated and that Landlord would take all financial responsibility for the Mine's maintenance, including transferring the electricity meter into Landlord's name.  ER 623-657, 631; ER 592-593;; ER 597-598l; ER 599-603.

- Debtor's board passed a resolution on February 19 instructing its officers "to take all necessary steps to vacate the premises immediately and release the mine back into [Landlord's] hands with final documentation to be completed on 3:00 p.m. next Tuesday, February 24th."

- In accordance with the February 19 resolution, Debtor's officers executed a February 19 waiver in favor of Landlord in which Debtor acknowledged "its intent to terminate and relinquish possession and control of the Leased Property to SPMI on or about February 24, 2009.  Sterling will instruct counsel to formally acknowledge default of the terms and conditions and termination of the Lease, which is forthcoming."

- In accordance with the February 19 resolution, Debtor's officers transferred possession of the Mine to Landlord on February 19.

There are only three ways to interpret these facts.

**APPELLANT'S OPENING BRIEF - 14**

First, the Lease was terminated on or about February 19.  This is the correct interpretation.  Debtor's board authorized termination and delivery of possession of the Mine.  Debtor delivered possession of the Mine.  Debtor acknowledged that an agreement to "formally acknowledge . . . termination [would be] forthcoming."  Landlord admits this anticipated future document was never executed.  Nonetheless, the parties expressly agreed that this future document was designed "to formally acknowledge . . . termination," meaning, clearly, that termination had already occurred.  To "acknowledge," according to Black's Legal Dictionary, is to "recognize one's actions, and assume the responsibility therefor."  H.C. Black, *Black's Legal Dictionary* 23 (6th ed. 1990).  The action – termination – had already occurred.  That Debtor did not subsequently "recognize" that action in writing is not material.

A second way to interpret these facts is the incorrect interpretation adopted by the bankruptcy court.  The bankruptcy court held that the events that took place were not sufficient to constitute termination because the February 24 "final documentation" was never executed and because a temporary restraining order[11] was entered at about this time in any event that barred Debtor from taking the final steps to complete termination.  ER 623-657; 644-654.

A third way to interpret the above facts would – like the first interpretation above – require reversal of the bankruptcy court's order.  The parties clearly agreed to termination and agreed that additional documents were to be executed.  While it is true that the February 24, 2009 documents were never executed, they were delivered by Landlord to Debtor.  ER  605A-605B.  While it is true that a temporary restraining order was entered, the record reveals that Debtor agreed to entry of the TRO.  ER 582A-582B.

Debtor cannot legally sabotage its obligation to perform the requirement that the February 24 documents be signed (to the such an obligation existed, which Landlord denies).

**APPELLANT'S OPENING BRIEF - 15**

Under Idaho law, parties have an obligation to perform their contractual obligations in good faith. *Idaho First Nat'l Bank v. Bliss Valley Foods*, 121 Idaho 266, 287, 824 P.2d 841, 853 (1991). A more specific component of the duty of good faith is that where a contractual right is dependent upon the performance of a condition, if one party prevents the performance of the condition, the party burdened by the condition is excused from seeing that the condition is satisfied. *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 490, 81 Cal. Rptr. 3d 72, 100 (Ct. App. 2008). The court should apply that rule here, to relieve Landlord from obtaining the February 24 document, to the extent that such an agreement was a condition of termination.

Taken in their totality, these statements and events evidence the parties' intent and mutual understanding that the Lease had in fact terminated. Like in *In re Wegner*, 839 F.2d 533 (9th Cir. 1988), termination in this case was not changed by the fact that Landlord provided Debtor with additional time to remove its personal effects or that all the specifics of the transfer had not been formally determined. Rather, Debtor intended to surrender its interest in the Mine, communicated this intent to Landlord, the parties mutually agreed to terminate and Debtor relinquished possession of the Mine.

Whether the Lease terminated on February 18, the date of the teleconference; February 19, the date of the board's resolution, transfer of possession, Debtor's waiver of conditions in the Lease and Landlord's assumption of all financial responsibility for the Mine; or February 24 is largely irrelevant because ultimately each date *predated* Debtor's March 3rd bankruptcy filing. Because termination of the Lease occurred before Debtor's March 3rd bankruptcy filing, the bankruptcy court erred in concluding that the Lease was "assumable" when, as a matter of law, the Lease had already effectively terminated prepetition. Accordingly, the Court should reverse the bankruptcy court's ruling on this issue.

---

[11] ER 1076-1078.

**APPELLANT'S OPENING BRIEF - 16**

**C.** **Since the Lease Was Terminated, this Court Should Vacate the Bankruptcy Court's Order Compelling Landlord to Return the Mine to Debtor.**

Because the bankruptcy court found that the parties' prepetition Lease remained in effect, the bankruptcy court ordered Landlord to turn over possession of the Mine to Debtor.  ER 713-721, 722.

For the reasons set forth in argument B above, *supra*,  15-19, this Court should find instead that the Lease was terminated prepetition.  Accordingly, Debtor has no further right to possession of the Mine and this court should vacate the bankruptcy court's order compelling Landlord to give up possession of the Mine.  This court should order Debtor to re-deliver possession of the Mine to Landlord.

**D.** **The Bankruptcy Court's Decision that Debtor Satisfied Bankruptcy Code Section 365(b) and Could Therefore Assume the Lease Was Erroneous.**

       1.    Bankruptcy Code Section 365(b) Requires that Defaults Be Determined and Cured as Part of Assumption.

A debtor's decision to assume an executory contract is not a unilateral decision, but is instead subject to the court's approval.  Bankruptcy Code § 365(a); *In re Harris Mgmt. Co.*, 791 F.2d 1412, 1414-15 (9th Cir. 1986).  Such approval requires, *inter alia*, a showing that the debtor has complied with section 365(b).  *In re RVP, Inc*., 269 B.R. 851, 853 (Bankr. D. Idaho 2001).

Section 365(b) "forc[es] the debtor to . . . cure any prepetition defaults upon assumption." *Coleman Oil Co. v. Circle K Corp*. (*In re Circle K Corp*.), 190 B.R. 370, 376 (9th Cir. BAP 1996).  More specifically, the statute requires that "[i]f there has been a default in an . . . unexpired lease . . ., the trustee may not assume such . . . lease unless, at the time of assumption of such . . . lease, the trustee cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ."  Bankruptcy Code § 365(b)(1)(A) (internal headings and punctuation

**APPELLANT'S OPENING BRIEF - 17**

omitted).  Where a default exists, "it [is] required [that] Debtor . . . explain the proposed manner of cure in order to prove that § 365(b) [is] met."  *In re RVP, Inc*., 269 B.R. at 854.

Since cure is a precondition to assumption, the identification and quantification of outstanding defaults is thus one of the bankruptcy court's principal tasks in ruling upon a motion to assume an executory contract.  *Id.*; *In re C.W. Mining Co*., 2009 WL 3568635, at *3  (Bankr. D. Utah 2009).  "It is particularly important for a bankruptcy court to know to what degree a debtor is in default on an executory contract because a debtor cannot assume such a contract unless the debtor satisfies several statutory conditions designed to make the non-debtor contracting party whole."  *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 489 (2d Cir. 2008).  *See also In re M. Fine Lumber Co*., 383 B.R. 565, 570 (Bankr. E.D.N.Y. 2008).

As is the case with section 365 generally, the requirements of section 365(b)(1) must be strictly adhered to.  *In re RVP, Inc*., 269 B.R. at 854; *In re Nat'l Gypsum Co.*, 208 F.3d 498, 512 (5th Cir. 2000).  Whether section 365(b) is satisfied in a given case depends both upon the "facts and circumstances of each case" and the "balancing [of] the equities."  *In re M. Fine Lumber Co.*, 383 B.R. at 570; *In re C.W. Mining Co*., 2009 WL 3568635 at *3; *Lewis Indus. v. Barham Constr., Inc*., 878 F.2d 1230, 1231 (9th Cir. 1989) (*citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).  *See also In re U.S. Wireless Data*, 547 F.3d at 488 ("Assumption . . . is subject to court approval based on a review of the totality of the circumstances.").  Debtor bears the burden of proving that it will cure the defaults.  *In re F.W. Restaurant Assocs., Inc*., 190 B.R. 143, 147 (Bankr. D. Conn. 1995); *In re Embers 86th St., Inc*., 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995).

Because the determination whether defaults exist is so critical, the procedure employed is important.  *See generally Sea Harvest Corp. v. Riviera Land Co.,* 868 F.2d 1077, 1079 (9th Cir. 1989); *In re RVP, Inc*., 269 B.R. 851.  Bankruptcy Rule 6006 provides that in order to assume an

unexpired lease, the debtor must either proceed by motion under Bankruptcy Rule 9014 or seek assumption in the plan of reorganization.  Here, Debtor proceeded by motion.  Where the debtor proceeds by motion, "reasonable notice and opportunity for hearing [must] be provided. . . . The motion *shall state with particularity the grounds therefor . . . .*"  *In re RVP, Inc*., 269 B.R. at 854 (citing and quoting Bankruptcy Rules 9014 and 9013) (emphasis added in opinion).  Notice must be served upon the non-debtor party to the lease, other parties in interest, and the United States trustee.  Bankruptcy Rule 6006(c).

If the non-debtor party to the executory contract has received satisfactory notice of the motion to assume but fails to assert her default claim when the debtor's motion comes before the bankruptcy court, then she is precluded from recovering on the claim later in the bankruptcy case.  *In re U.S. Wireless Data, Inc*., 547 F.3d at 494, 496.  This is so even when the creditor files her claim prior to the bar date for the filing of unsecured claims in the case (but subsequent to the executory contract assumption determination).  *Id*., 547 F.3d at 491, 496.   Bankruptcy courts sometimes establish a formal bar date specifically for the filing of claims arising in respect of an executory contract that is the subject of a motion to assume, just to make crystal clear that the creditor must assert its cure claim.  *Id*., 547 F.3d at 489-490; *In re C.W. Mining Co*., 2009 WL 3568635, at *1.   Further, if the debtor fails to disclose known defaults to the bankruptcy court, and fails to cure those defaults, the bankruptcy court will revoke its order assuming the contract even if the non-debtor party received notice of the motion.  *In re RVP, Inc*., 269 B.R. 851.

> 2. <u>The Bankruptcy Court's Approval of Debtor's Assumption of the Lease Was In Error Because the Amount of the Defaults to EPA and the Tribe Were Not Determined or Cured</u>.

The above analysis makes clear that (i) the bankruptcy court's adjudication of existing defaults, and (ii) the debtor's cure of those defaults (or, at least, adequate assurance of a prompt

cure) are necessary preconditions of the assumption of an executory contract. The bankruptcy court cannot approve assumption unless the defaults are identified and the debtor proves it will cure those defaults. *In re C.W. Mining Co.*, 2009 WL 3568635, at *3 ("After the trustee forms his intent to assume . . ., § 365(b) requires the court to determine whether a default exists in regard to an unexpired lease. The court must then determine whether the trustee can cure or provide adequate assurance of prompt cure . . . *before* the court can approve a motion to assume.") (emphasis added). However, none of these events took place here. Accordingly, the bankruptcy court's order allowing assumption was in error. The bankruptcy court allowed a casual process to substitute for the rigorous process that the Bankruptcy Code requires.

The essential facts here are quite simple. The Lease requires that Debtor make the net smelter return royalty payments required of it to EPA and the Tribe under the consent decree. Debtor operated the mine prepetition but failed to make the royalty payments. The consent decree provides that if Debtor fails to make the royalty payments, penalties become owing. Debtor did not make any prepetition penalty payments either. All of those facts were before the bankruptcy court.

Thus, in accordance with the Bankruptcy Code provisions and case law cited above, before the bankruptcy court could approve Debtor's assumption of the Lease, it was necessary that the amount of the respective royalty and penalty defaults be determined, and Debtor further was obligated to satisfy its burden of proving that it could cure the defaults (or, at least, Debtor needed to provide adequate assurance that it could promptly cure the defaults).

But the bankruptcy court gave Debtor a pass and did not require it to make any of these showings.

The key pages of the bankruptcy court opinion are found in this court's excerpts of record at pages ER 723-726, 734-737. There, the bankruptcy court acknowledged that royalty payments

and penalty payments were asserted and unpaid and the amount of the defaults was unresolved. Nonetheless, rather than (i) requiring that the amount of those defaults be determined and (ii) requiring that Debtor prove it would and could cure the defaults, the bankruptcy court remarkably approved Debtor's assumption of the Lease in the absence of any of the statutory tests being satisfied.

This court should review the bankruptcy court's conclusions de novo.  There are no findings of facts at issue that necessitate a clearly erroneous standard.  The bankruptcy court's failure to require Debtor to satisfy section 365(b)(1) was a conclusion of law that was in error.  A detailed explication of the Bankruptcy Court's failure to apply section 365(b)(1) properly to the determination of the royalty default; the determination of the penalty default; the determination of the environmental default; and the proof of cure, follows.

> **a.      The Bankruptcy Court Erred In Applying Bankruptcy Code Section 365(b)(1)(A) to the Net Smelter Return Royalty Default Because it Did Not Determine the Amount of the Default.**

The bankruptcy court did not determine the amount of the net smelter return royalty default. ER 723-768, 734-735;  Debtor conceded that the default equaled $382,020.95.  ER 723-768, 735;  The bankruptcy court, however, did not actually determine the amount of the default. It, curiously, merely acknowledged Debtor's admission and used Debtor's admission as the amount that must be cured upon assumption.  ER 723-768, 734-735, 768; .  The bankruptcy court did not satisfy its obligation to adjudicate the amount of the net smelter royalty return default.

Nowhere in its lengthy opinions did the bankruptcy court hold that Landlord, EPA, or Tribe was precluded from later contending that the unpaid net smelter return royalties exceeded $382,020.95.  In other words, the bankruptcy court determined that $382,020.95 was the best estimate of the royalty default as of August 21, 2009, but it did not adjudicate the true amount of the prepetition default.  Indeed, at the time of the lease assumption hearings, Debtor had not yet

provided complete disclosure of the documents necessary to determine the amount of the net smelter return royalty but the hearing continued notwithstanding this failure.  Both the Tribe and EPA have now filed their proofs of claim, in which each contends that while the unpaid net smelter return royalty equals at least $382,020.95, it may well be more. ER 774-907, 908-921;

Accordingly, the bankruptcy court has now ostensibly approved assumption even though there has been no determinative adjudication of the amount Debtor owes EPA, the Tribe, and Landlord for failing to pay the net smelter return royalties.

> **b.**   **The Bankruptcy Court Erred by Applying Bankruptcy Code Section 365(b)(1)(C) to the Penalty Default Rather than Bankruptcy Code Section 365(b)(1)(A).**

Likewise, the bankruptcy court did not determine the amount of the penalty default that arose out of Debtor's failure to pay the net smelter return royalties.  ER 723-768, 735-737; Sunshine put on proof that the penalties could total as much as $1.455 million.  ER 684;.  In fact, EPA and the Tribe have filed penalty claims in excess of that amount.  ER 774-907, 908-921; Debtor recently admitted the penalty claims could total as much as $4.0 million.  ER 989-993, As was the case with the net smelter return royalty, the bankruptcy court did not satisfy its obligation to adjudicate the amount of the default.

Whereas the bankruptcy court in the case of the royalty default obscured its failure to determine the amount of the default, *supra* at 21-22, the bankruptcy court admitted that the amount of the penalty default would not be adjudicated.  The bankruptcy court admitted that "[o]n the state of the record, it is impossible to ascribe a precise figure to this category of asserted default that must be paid by the DIP as a condition of assumption."  ER 723-768, 735. The bankruptcy court held that the amount of the default would "be heard, as appropriate, at a later time and upon proper notice."  ER 723-768, 736, n. 21.

For a bankruptcy court to simply postpone determination of the cure amount violates Bankruptcy Code section 365(b)(1)(A).  The stated justification of the bankruptcy court's postponement of the adjudication of the penalty default amount was that that obligation was subject to Bankruptcy Code section 365(b)(1)(C), rather than Bankruptcy Code section 365(b)(1)(A).  ER 723-768, 736, n. 21, 742, n.26.  However, these are two very different subsections  which serve different purposes.  The bankruptcy court's application of subsection (C) to the penalty claim was reversible error.

Section 365(b)(1)(A) is the subsection analyzed at length above.  It requires that the existing defaults be identified, their amount be determined, and that they be promptly cured (or, at least, that the debtor provide adequate assurance of prompt cure).

Subsection 365(b)(1)(C), on the other hand, concerns "*future performance* under [the] lease"  (emphasis added).  Under that subjection Debtor must provide "adequate assurance of *future performance*" (emphasis added).  Determining whether the debtor can provide "adequate assurance of future performance" under section 365(b)(1)(C) is, unsurprisingly, a much more nebulous and inexact art than the science of determining the amount of the existing defaults under section 365(b)(1)(A) and requiring that the debtor cure those defaults.  Determining whether adequate assurance of future performance has been proved necessarily involves predicting the future.  Charged with gazing into a crystal ball, courts look to a seven part test.  *In re M. Fine Lumber Co*., 383 B.R. 565, 573 (*citing Richmond Leasing Co v. Capital Bank, N.A.*, 762 F.2d 1303, 1310 (5th Cir. 1985)).

Determining whether the bankruptcy court should have applied section 365(b)(1)(A) or section 365(b)(1)(C) to Debtor's motion to assume is a question of statutory interpretation that this Court reviews de novo.  *Fitzgerald v. First Sec. Bank*, 178 B.R 497, 498 (D. Idaho 1994) (Lodge, J.).  The critical question is whether the unpaid penalty obligations constituted an

existing default as of the date of the determination of the motion to assume, or, instead, whether they involved "future performance" under the lease.

The answer to this critical question is clear.  Debtor's penalty default under the Lease was an existing default subject to quantification and cure subject to section 365(b)(1)(A), not a question of "future performance" that the debtor and bankruptcy court could defer under section 365(b)(1)(C).  As noted above, Debtor operated the Mine prepetition.  It failed to make the royalty payments prepetition.  The penalties arose in respect of Debtor's prepetition conduct.  Given that only prepetition events are at issue, there was no basis for the bankruptcy court to conclude that the penalty claims involved a question of "future performance" subject to Bankruptcy Code section 365(b)(1)(C) rather than a presently existing default subject to adjudication and cure under Bankruptcy Code section 365(b)(1)(A).

The bankruptcy court's key conclusion on this issue were relegated to footnotes and contained no citation to case law.  ER 723-768, 736, n.21.  Landlord believes that there is no case law to support the bankruptcy court's conclusions that the penalty default are subject to subsection 365(b)(1)(C) rather than (A).  Debtor did not cite to any such cases in its filings in the bankruptcy court.

Accordingly, the bankruptcy court has now ostensibly approved assumption even though there has been no adjudication whatsoever of the amount Debtor owes EPA, the Tribe, and Landlord for the penalties that arose in light of its failure to pay the net smelter return royalties.

       c.       **The Bankruptcy Court Erred by Applying Bankruptcy Code Section 365(b)(1)(C) to the Environmental  Remediation Obligations Rather than Bankruptcy Code Section 365(b)(1)(A).**

As noted above, the Lease requires that Debtor indemnify Landlord from all governmental environmental claims.  ER 100-0123, 9.  Accordingly, Landlord presented evidence to the bankruptcy court of Debtor's many environmental obligations associated with the

**APPELLANT'S OPENING BRIEF - 24**

Mine, and contended that Debtor's obligation to meet all of its environmental obligations constituted part of Landlord's cure claim.  ER 723-768, 738-743;

The bankruptcy court, however, treated Landlord's environmental claims in the same improper way it treated Landlord's penalty claims.  Instead of determining the amount of Landlord's claims under Bankruptcy Code section 365(b)(1)(A), the bankruptcy court avoided the necessary analysis on the basis that it the claims were subject to Bankruptcy code section 365(b)(1)(C), regarding adequate assurance of future performance.  The court held, in a footnote and without citation to any case law, that its "findings and conclusions [regarding Debtor's environmental obligations] do not necessarily mean that there are no environmental issues. . . . The DIP agrees that it must comply with the requirements of §13.5 of the assumed Lease.  . . . The question at this stage is one of adequate assurance of future performance."  ER 723-768, 741-742, n.26.  This conclusion permitted the bankruptcy court to approve assumption without actually quantifying the dollar amount of Debtor's existing environmental obligations or assuring that such amounts would be paid upon assumption.

The result of the bankruptcy court's determination is exactly the same as is the result with respect to the penalty claims.  EPA has filed a multimillion dollar environmental claim against Debtor in connection with prepetition events.  ER 908-921.  Notwithstanding that Debtor's assumption of the Lease has ostensibly been approved, and notwithstanding that Landlord is entitled to a full cure of the defaulted amounts, the EPA claim is wholly unliquidated and Debtor has not put on any proof that it can cure the defaults.

> **d.    The Bankruptcy Court Erred by Failing to Require Debtor to Bear Its Burden of Proving that It Would Cure the Defaults Under Bankruptcy Code Section 365(b)(1)(A).**

As the case law explored above makes clear, assumption requires that the debtor prove that the non-debtor party will be made whole.  This "requirement effectively confers priority

status on claims of default arising under an assumed contract.  The resolution of these claims, generally referred to as 'cure claims,' strives to restore the 'debtor-creditor relationship . . . to pre-default conditions."  *In re U.S. Wireless Data, Inc*., 547 F.3d at 489 (omitting internal citations).

How could Debtor have met its burden of proving it would cure its defaults under the Lease when the amounts of those defaults was not adjudicated?  The bankruptcy court apparently held that Debtor has the capacity to cure a royalty default in the amount of $382,020.95, but that conclusion is legally irrelevant because the bankruptcy court did not find that $382,020.95 represented the entirety of the royalty cure claim.  The bankruptcy court never made any finding that that Debtor could cure the penalty claim or the environmental claim under Bankruptcy Code section 365(b)(1)(A) because the bankruptcy court never applied that subsection to the penalty and environmental cure claims.

Ultimately, then, the bankruptcy court has approved assumption even though there is no guarantee in place for the benefit of Landlord, EPA, or the Tribe that Debtor will pay the entirety of the contract defaults.  This is exactly the predicament that Bankruptcy Code section 365 forbids.

        **e.**      **Subsequent Events Reveal that the Bankruptcy Court Put the Cart Before the Horse.**

The bankruptcy court put the cart before the horse.  That is, the court approved Debtor's assumption of the Lease before the court adjudicated the existing defaults and determined that Debtor was capable of curing the defaults.  Subsequent events in the bankruptcy case clearly bear this out, and demonstrate unequivocally that Landlord does not enjoy the certainty to which it is entitled as the non-debtor party under an assumed executory contract.

**APPELLANT'S OPENING BRIEF - 26**

Debtor filed its disclosure statement and proposed plan of reorganization on December 2, 2009.  Neither the disclosure statement nor the plan has yet come before the bankruptcy court for a hearing.

The disclosure statement and plan are significant to this court's analysis in two principal regards.  First, they characterize the Lease as an assumed contract, ER 100-123, 102, but freely admit that the EPA and Tribe penalty claims, which "have been estimated to be . . . as high as $3,800,000," have yet to be quantified.  Debtor admits the penalty claims will need to be settled or litigated.  ER 922-964, 929.

Second, the disclosure statement and plan reveal that Debtor likely lacks the money to cure its defaults under the Lease, even though the Lease will ostensibly be assumed.  This is the result that the Bankruptcy Code forbids.  The disclosure statement provides that the entity who will be buying the stock of the reorganized debtor will be paying $3.1 million.  However, the plan and disclosure statement provide Debtor has already allocated all of that money to creditors other than EPA or the Tribe.  In other words, Debtor's own plan seemingly shows that the cash to be realized from the plan's funding source will be consumed in its entirety before a penny is to be paid to EPA or the Tribe on the cure claims, even though those claims could well be as high as $4.0 million.  ER 0994-1002, 997-998.  And it is not merely Landlord who believes that the numbers in the plan and disclosure statement do not add up.  The U.S. Trustee has reached the same conclusion.  ER001003-1010.

Further, on December 22, 2009, Debtor filed in the bankruptcy court its "Motion to Determine Penalty Amount Due EPA/Coeur D'Alene Tribe" ER 989-993  (the "Claim Objection").  In the Claim Objection, Debtor admits that the "Tribe and EPA assert a penalty of roughly $4.0 million." ER 989-993  p. 993.  Debtor admits that the bankruptcy court did not determine the amount of the penalties when it ruled on the motion to assume.  ER 989-993, p.

**APPELLANT'S OPENING BRIEF - 27**

991.  In the Claim Objection, Debtor objects to the penalty claims and asks the Court to set the

matter for an evidentiary hearing.  The Claim Objection is thus nothing less than another

admission by Debtor that none of the requirements of section 365(b)(1)(A) were satisfied when

the bankruptcy court granted Debtor's motion to assume.

## VII.   CONCLUSION

Successful reorganizations of publicly-held companies are few and far between in this

district.  Eager to see Debtor claim the benefit of the supposedly below-market purchase option

for the benefit of the bankruptcy estate, the bankruptcy court found that the Lease had not been

terminated prepetition and that Debtor had satisfied Bankruptcy Code section 365.

But the Lease clearly was terminated prepetition.  This Court should so find and vacate

the bankruptcy court's order authorizing assumption.  As part of that ruling, this court should

order that the mine should be returned to Landlord.  At the least, this Court should remand the

case so that the bankruptcy court properly applies Idaho law.

If this Court holds that the bankruptcy court's conclusion that the Lease remains in effect

was correct, it should nonetheless vacate the bankruptcy court's order holding that Debtor may

assume the Lease.  Debtor did not make the showing required of it by the statute to assume the

Lease.  This court should revoke the bankruptcy court's order approving assumption.  It should

remand the matter to the bankruptcy court so that the question of assumption can be determined

contemporaneously with (i) litigation of the royalty, penalty, and environmental claim amounts,

and (ii) Debtor's receipt of the funds necessary to make the cure payments.

**APPELLANT'S OPENING BRIEF - 28**

DATED this 4th day of January, 2010.

HOLLAND & HART LLP


By _____/s/ Robert A. Faucher_____
        Robert A. Faucher, of the firm
        Attorneys For Sunshine Precious Metals, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January 2010, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **Bruce A Anderson**
  baafiling@ejame.com

- **Robert A Faucher**
  rfaucher@hollandhart.com,ntpratt@hollandhart.com,BoiseIntakeTeam@hollandhart.com

- **Douglas B Marks**
  dmarks@ejame.com


                                                /s/ Robert A. Faucher
                                        for HOLLAND & HART LLP

4672569_3.DOC

**APPELLANT'S OPENING BRIEF - 30**